All right. We'll take the last cases of the morning. These are consolidated. If we need a little more time because of the complexity of the facts, we'll give you some more time. Number 19-60071, STP Nuclear Operating Company v. NLRB, Ms. Rogers. May it please the Court, my name is Amber Rogers and I represent Petitioner STP Nuclear Operating Company. The Board in this case both oversimplified and underestimated the responsibilities inherent in unit and maintenance supervisor positions. In a more egregious manner than occurred in Energy Mississippi, the last case in which this Court examined Section 211 supervisory status issue, the Board here flat out ignored and failed to both records. This Court held in McCulloch Environmental Services that when the NLRB ignores the nature of the operations as it did in McCulloch, it resulted in this Court denying the NLRB's enforcement application. The same thing occurred here with STP Nuclear and should end in the same result. When the Board makes a decision that fundamentally ignores the industry and the realities of that particular workplace, it has failed to examine the record as a whole and its decision is not entitled to this Court's deference. The Board's decision here wholly ignored one of the first and critical things that was testified about in the underlying hearing. William Jefferson, the company's operations director, for almost the first third of the transcript testifies specifically on pages 24-25. He says that the nuclear plant is a very, very highly regulated business, that they have two regulators that are assigned on site at all times. They have two regulating bodies that oversee the company, the Nuclear Regulatory Commission and the Institute of Nuclear Power Operations. The Board makes no mention of this at all in either of their decisions. Mr. Jefferson also importantly testified about what he called the level of intrusiveness that management has and he testified that here it's much more in the nuclear industry than it is in other types of energy generation. He said the whole industry is this way. He said management of all levels are heavily involved in what the levels below them are doing and the reason for this redundancy, he said, is safety. He said it's a safety reason that's unique to the nuclear industry. And again, this is testimony and topics that the Board wholly ignored and doesn't discuss at all in its decisions. In Main Yankee, which is a First Circuit case, is instructive here. In that case, the First Circuit took judicial notice, which this court can do, that a nuclear generation facility, because of the enormous forces involved and the possibility of radioactive contamination, entails a potential for harm to property and life in the event of accident of an order altogether different from that of a conventional power plant. Well, if you don't mind my saying so, the issue here is not the overall safety of the plant, although some of the facts regarding that may cut in your favor, but it's simply whether these kinds of supervisors should be joined within the bargaining unit. And what interests me is apparently some of those supervisors did testify in favor of the union, right? They did. They did. Why? I mean, what's the big deal? If nobody ever leaves their job, they all retire. There's a union covering five. What's the impetus for additional people to be in the union? Well, I don't think the record really speaks to it. I know in the second case, the maintenance supervisor, we attempted to ask some questions to inquire about his, I believe it was Supervisor Wilkinson, to inquire as to whether or not he voted to join the union because they're going to get free health care after being a supervisor, I think, for around 26 years. But ultimately, you know, why people joined isn't voted to be in the union isn't really in the record. Well, it doesn't seem interesting to me. Yeah, I think there are motivations, certainly, Judge, for why people testified the way they did and chose to vote the way they did, but that doesn't, it's just not in the record. Okay, well, paring it down to the precise issues here, as I understand the law, all you have to demonstrate is that either the maintenance supervisors or the power plant supervisors had discretion and responsibility with respect to one of a number of factors. Is that correct? That is the law, yes, yes, Your Honor. All right, so why don't you explain to us which is your strongest argument in those regards? Okay, so I think I'll take several factors here. One, that the board just, again, totally ignored and doesn't address any evidence about regarding the maintenance supervisors is their ability to transfer employees. Each of the units, sorry, maintenance supervisors that testified all talked about their ability to go to other crews, to take employees and move them around. They talked about their rationale for that, that they are able to evaluate the skill set of the employees that they want to take. So, if they need to train someone or if someone is a better worker, has a stronger skill set, those are some of the factors that they'll take into account when they are transferring workers between the different crews. The testimony here was uncontroverted, that they were able to do that without managerial oversight, that no manager had ever overruled their decision to do that, and then manager Thornton, who is a statutory, who's a stipulated supervisor, testified that he had never, you know, overruled any member of any unit maintenance supervisor on his crew who did that. And the ALJ basically overlooked that point. Totally overlooked. It's only, I think the word transfer gets mentioned in the, you know, in the use of the statutory definition and then maybe one other time, just to, in a throwaway sentence, say they don't transfer and they don't do a few other of the factors. Another factor that the . . . I mean, excuse me, but the board argues here that your brief doesn't make, and therefore you say you waived at any claim that the unit supervisors can take corrective action, and that's a pretty vital element of how your job is to take corrective action. They also said when you, when you appeal to the regional directors, you fail to argue the unit supervisors are accountable for their subordinates. So those two related concepts, they say you never made those arguments. No, I think there is, we did make those arguments, and there's testimony to support those, and I think that goes to the board's overstatement of the Oakwood test and this court's Energy Mississippi decision. The board in both decisions is attempting to hold the company to a higher standard. It's attempting to basically say that the supervisors had to actually engage in or suffer an adverse consequence versus just the prospect. In the testimony from both, we have . . . Well, let me come back to this point. The reason I make, I raise it is not some technical procedural point, but the National Labor Act itself says that, quote, no objection that is, that has not been urged before the board, its member agencies, shall be considered by the court. In other words, they, there's a statutory emphasis upon the, where you first make these, these arguments. They, I've got to go back and look at your opening brief, but I didn't see it there. Perhaps I missed it. And the same is true with regard to the, where the unit supervisors are accountable for their subordinates. I think the, I think our brief, and I don't have the pages in front of me, but I think the briefs do talk about the supervisors being held . . . Well, you made those arguments. Right. Because my recollection . . . I don't want to hold you up on your arguments. You could do that. The argument was that this had hardly ever happened, that one time 20, 25 years ago, one supervisor had a letter in the file or something like that. That's what I was about to say. Yeah. I mean, there was evidence. It's Roger, Supervisor Roger Wilkinson, and we do discuss that incident that happened. And I have to go farther here and interject that not only there's little evidence about supervisors being held accountable because there is no evidence of supervisors having made mistakes, right? Well, I think that that's a very important . . . So how can they hold it against you if nobody's making mistakes? And I think this goes to my opening point, Judge Jones, is the Board ignoring substantial evidence in the record that . . . For instance, from Sean Flaherty, who testified that this is a type of company that you don't see disciplinary problems from. And I think the testimony is there in the record and was ignored by the Board that . . . a few things that were ignored that go to this point. One, the safety consciousness. And again, this goes to what Mr. Jefferson testified about, that because this is a heavily regulated industry and company, this is not the type of industry or company where you can have mistakes. It has catastrophic results. So that is why you have supervisors looking so heavily over each particular level. So, no, there really aren't a lot of that the supervisors, the unit and maintenance supervisors, are very frequently correcting and counseling their subordinates when they see things happen. Because again, the goal is to catch it early. This isn't the type of industry or company where, you know, an employee puts five shakes of salt on the fries versus four, and the mistake doesn't have a, you know, some sort of huge result. The result here is if a person makes a mistake, we have every mile island. We have, you know, which is referenced in Maine Yankee. That's the type of result you get here. And again, the Board wholly ignores that and never discusses at all that, again, mistakes, while slight or minor, when they happen, they do get addressed. And there's plenty of record evidence of these counseling sessions that take place. You can't say that the company has the burden to prove this, but there's nothing to show that there's anything that needed proving, I guess. Because the idea that they had accountability up the line or responsibility for counseling and discipline is one thing, but it's just that can't, I don't think that it's logical for the NLRB to hold that against the company. But I would agree. What we also do have, Your Honor, in this is that goes to the point of adverse consequences being a potential, even though it has not occurred. Supervisor Taylor, and this is on record 315, says that while his crew has never done anything that would warrant his discipline, he knows he would be disciplined if it happened. He said the same thing on record 242. He says that he's accountable for his crew safety. If they get hurt, he's sure that he won't get in trouble. Supervisor Presswood said that he's held accountable for his crew's performance that was record 217. So I think what you have are these supervisors who have been in these roles for some decades testifying that, yes, while this has not happened, I do know I'm held accountable for the safety of my crew and their work performance, and I believe if it happened, something did happen, I would be disciplined. Which of these factors, since you only have to two maintenance supervisors and operational supervisors? I think I would say assign and responsibly direct. I think we argued more of the factors for the maintenance supervisors, and that I've highlighted some already, but another of the strong ones, I believe, so I'd say a third is the ability to reward. So in terms of assigning, I think there's testimony there that, regarding time, that the maintenance supervisors testify that they are able to assign overtime. The board tries to discount that by saying, you know, oh, it's only a slight amount of overtime, but that, again, that's a heightened standard that they're trying to create here for the company. On assigning work for maintenance supervisors, does the authorized work schedule present a problem for your argument? It doesn't. No, it does not. So I think the board significantly, and again, because it ignores so much evidence in this case, ignores what the authorized work schedule really is. It basically says what work needs to be done. Some examples of it are in both records, what the AWS looks like, but it does not tell you, Judge Duncan, who is to do that work. It doesn't definitively say the work has to be done on January 7th, 2020, and the testimony is from multiple supervisors. So, for instance, Supervisor Hamilton testifies that I get to decide who I assign work to and how I assign that, and the testimony, again, is from multiple of the supervisors that I look to things such as the skill set. I look to who needs to be trained on a particular task. I will look to who needs to, who has the qualifications to do it, who has the proper cases. So, for instance, Main Yankee, this court's case, I believe McCullough, Dale Services, are just a few that discuss this issue of companies that have a lot of outlines and procedures and manuals, and even in McCullough, I believe it goes to, in quotes, that where it may be sort of a small or limited amount, I think, of judgment, it says that still doesn't negate that the person is responsibly directing the work, and ultimately here, you know, as in a manual or something that has some overall task, but it ultimately doesn't cover everything. It doesn't tell you how to do everything. So, again, the board ignored substantial evidence in the record about that. So, and I'll also just quickly get to sort of the responsibly directing. I've already talked about the adverse consequence portion of that, but I think you have, we have evidence in the record, Record 69, about unit supervisors, they stand over the reactors to direct what they do. Record 152, the unit supervisors have to know the sort of big picture that's trying to be accomplished in the plant. They talk about knowing the plant conditions, and those are sort of things that they will use when they are doling out work to their subordinates. Various record sites talk about, and I think this is an important one, that the board misses in a number of cases discussed, is the supervisor's ability in an emergency situation to handle that on their own. So, specifically, Supervisor Hamilton testifies that if an emergency comes up, I'm the guy. I handle it on my own. I don't have to go to my supervisor immediately because my supervisor has his own role that he's playing in an emergency situation. In the cases, several of them speak to the emergency issue that I think is important here that it goes to this responsibly direct factor. So, Southern Indiana Gas and Electric, it's a Seventh Circuit case. This court's decision in McCullough Environmental, Maine Yankee, and then also Mongahela Power Company, a Fourth Circuit case, just all speak to the ability of a supervisor to act in an emergency situation. I'll just close here by saying they also highlight, importantly, that just because you then have to, you know, or sort of as a natural course, report to your supervisor that some what you did in an emergency does not negate the fact that you were responsibly directing what happened in that instance. As this court, or sorry, as the court noted in Maine Yankee, it's a hierarchy that most companies have, and I think that's something, again, that the board just totally glosses over and ignores in examining multiple of these factors that, for instance, in hiring, they discount a hiring panel. That's just the way companies operate. It's not outside of the bounds. Was it correct that the maintenance supervisor selects the people who are on the hiring committee? They do. I think there's testimony that they get to, like, for instance, Supervisor Griffin testified that I, he wrote the questions, he picked the people who were going to be interviewed. Another one of the maintenance supervisors testified that when it came to a slate of apprentices, none of them were satisfactory, so he was the one who was able to select all of those people, and again, I don't think there's testimony that while this is happening in a panel format that the manager is then overruling them. Again, I think it's just normal business now that this is something, you know, I don't think the board really acknowledges. There are other laws out. You know, we have Title VII laws and other things that companies are trying to abide by, so sure, in a discipline situation or a hiring situation where a company is trying to ensure they're treating people fairly, you might send that to HR. You might send it to HR for a background check or something to ensure, but that doesn't negate that the manager, sorry, the supervisor on the front end is the one who recommended that the person be hired or recommended some sort of disciplinary action. I have one other question, and that has to do with the authorized work schedule. It seemed to me that, well, I gathered that the supervisors did, in fact, have some input into the makeup of that schedule. Is that correct? That is correct, Judge Jones, and again, that is something the board totally disregards and to the extent it's even mentioned is misstated. Specifically, I believe in the maintenance supervisor says they have no role in the process, which is categorically untrue. Multiple of the supervisors testify that at the T6 or T8 stage, it's a 14-week process, that they become very actively engaged in the process in determining what work needs to be done, if it's feasible, do they have the equipment, do they have the people, the certifications, so saying that they have no role in it, again, ignores huge portions of the record, and again, I believe because of that, the board ignoring all of that evidence, their decision is not entitled to deference. Okay. I think we have enough from your side, and we'll, you have time for rebuttal, and we'll hear from Ms. Rajapakse. Thank you, Your Honor. May it please the Court, my name is Neelakshmi Rajapakse, I'm counsel for the National Labor Relations Board. Substantial evidence does support the board's findings in these two cases that the company's unit supervisors and maintenance supervisors are not supervisors within the meaning of Section 211 of the National Labor Relations Act. And I would just say overall, I'd like to, because these cases came before the board on two separate evidentiary records, and they were separately litigated before the board, I'd like to discuss the cases separately, beginning with the unit supervisors. Before I do that, however, I will just say this Court has accepted the specific statutory definitions that apply. In Entergy, this Court endorsed the board's definitions of responsibly direct, independent judgment, and assign under the Act. And so we, I think, have to be very attentive to the specifics of those definitions which have been accepted in this Court. Assignment, and I'm going to turn to the unit supervisors first. Assignment means assigning people to a set of work hours, such as a shift, a location, or significant overall duties. In the case involving the unit supervisors, the company is claiming that unit supervisors assign people to a time or a shift. Those assignments are made by planners, not the unit supervisors. So the issue is just significant overall duties. And the company, as the board found, did not show that the unit supervisors assigned those significant overall duties. The overall duties are in the authorized work schedule, and I have to disagree with my colleague that the work schedule essentially is not a schedule and doesn't specify times. It is a schedule, and there are time frames within which certain tasks have to be performed. All the unit supervisors do is they dole out the tasks to the two or three operators or six or seven plant operators who work under them, and they cannot deviate. So there's no, the issue of independent judgment is highly significant. Even if you could construe their discrete tasks to people as an assignment of overall duties, which doesn't seem logical, even if you could do that, there isn't a showing of independent judgment in making these choices. The unit supervisors have to follow the authorized work schedule, and they can only deviate, and we know this from the testimony of Mr. Tillman, they can only deviate when four specific conditions are met. And then the nature of the deviation that's appropriate is also dictated by procedure, and I would call the court's attention to pages 326 to 328 of the record, which is Mr. Tillman's testimony on the point. In addition, there's always a person above the unit supervisor in the control room of these nuclear facilities. That person, the shift manager, would also weigh in on any deviation from the authorized work schedule, so that again undercuts any room for the exercise by the unit supervisors on their own. And on that point, I would cite the record at page 153 and pages 203 and 204, which is Mr. Hamilton's testimony, and the record at pages 281 to 283, which is Mr. Tillman's testimony. They were both in agreement that they would get buy-in from the shift manager on duty before they deviated or did anything. Frankly, they would try get that person's endorsement. I would briefly like to address Maine Yankee because that is a case involving the people in a control room at a nuclear facility. I will just note that, first of all, that case long predated Oakwood, and the board filed a motion to strike that contains its relevant arguments about Maine Yankee. I'll just reiterate, though, that the First Circuit, which issued Maine Yankee, said that that case is no longer really good precedent because it doesn't address the definitions of responsible direction and independent judgment under Oakwood. And likewise, this court has said that Oakwood is the touchstone now for issues of responsible direction. Turning to the issue, that issue of responsible direction, and before I do that, I'll just note also that McCullough Environmental Services is also a pre-Oakwood case. Several of the cases, in fact, that counsel cited are pre-Oakwood, and I would ask the court to be attentive to the distinction. In terms of responsible direction, it was in the case of the unit supervisors that the board said that responsibility is really not an issue before this court because the company didn't argue in its opening brief about the unit supervisors, that it had delegated authority to take corrective action. And before the board, in the case involving the unit supervisors, the company did not argue about accountability, and I would ask the court to look at pages 798 to 801 of the record, which is the company's request for review. That's the operative document where it should have raised accountability, and you'll find within those pages it argues responsible direction, but it doesn't argue accountability. And this court has been very clear that responsible direction involves essentially a showing of three things. The first thing is direction using independent judgment. The second is delegated authority to take corrective action, and the third thing is facing the prospect of adverse consequences if other people essentially mess something up. Don't you think, I mean, isn't it almost ludicrous for the board to contend that there's no accountability within the entire chain of command in a nuclear plant? The board hasn't said that. The board is just saying that these people are not held, there's no evidence that these people are held. But that's absurd, because these are the people who run the power generation. Right, and they're... Are they automatons? Are they robots? No. I mean, if something goes wrong... Right. I would ask the court again to look at the very specific definition of what accountability means under the statute. It means being accountable... But that's just, I mean, that's ludicrous, because the whole point of federal regulation, which is very comprehensive here, is to obtain total accountability throughout the process of generating nuclear power. Right, so it's certainly true that these people are accountable in the sense of being accountable for a process or for the facilities and the equipment. It is not shown on this record that the unit supervisors are responsible for others' actions, and I'm quoting from Entergy, Mississippi, at 810 F. 3rd, at pages 294 to 95, and specifically footnote one, where the court acknowledges that accountability for purposes of section 211 means being accountable for the performance of others, of employees. And so that is the specific showing that the company had to make in this case, and it didn't make that showing before the board, and so it can't begin to argue about that. How would you make a showing? You put a guy on, you put a supervisor on, and he says, if things go bad with my employees, I'm in deep trouble. Is that all it is that's required for that? No, and the court and the board cited in its brief a Seventh Circuit case that somewhat explains what it means to be able to take corrective action. For example, it means being able to place some small burden on the employee to enforce the direction that's given. So, for example, if the unit supervisor or the maintenance supervisors have the ability to discipline people or to affect their evaluations at the end of the year and note so-and-so didn't follow my directions, that kind of evidence would have been highly relevant. Is there evidence in the record of an incentive program with respect for unit supervisors that they might not, if the people under their direction don't perform adequately, they don't get the incentives that they would otherwise get? Isn't there evidence with respect to that? Well, there is evidence in the record on this, Your Honor. I'll just reiterate, though, in the unit supervisor case, the issue of accountability was not argued before the board, so it isn't before the court under Section 10e. However, the evidence on accountability that the downgraded two unit supervisors based on, supposedly, the failure of their crews to perform well, and only one of those unit supervisors testified, Mr. Tillman, and his testimony is that he wasn't aware of why he was downgraded. He wasn't told that it was for poor performance of his crew, and even his, and this is a quote, my shift manager said he didn't know either, and that's at pages 303 to 305 of the record, and so in the board's view, and I think this is reasonable, that doesn't establish that unit supervisors are made aware that they face the prospect of adverse consequences if their crews fail to perform properly. Turning to the maintenance supervisors, because I realize that my time is running, I'd like to just address those same two factors which the company today claims are its most significant showings of supervisory authority. Under assignment, once again, the same authorized work schedule informs everything that's done throughout the facility, including the maintenance I mean, it seems to me that just overlooks the reality of a functioning and very complicated production enterprise, because the whole point of having all these different maintenance crews is that things are going to go wrong, just as your light bulbs go out in the house at random and that sort of thing, and so you have this authorized work schedule, the same as I have a schedule of the house, but things happen, and therefore, you have supervisors who decide, where can I work within the authorized schedule in order to address this problem? Now, why is that not responsibly directing and assigning the process of work? Right, I mean, again, Your Honor, the issue is that there are three things. The showing is not simply directing others. It's responsibly directing, and what do you mean? Right, and so responsible direction requires a showing that these maintenance supervisors had delegated authority to take corrective action. There's absolutely no evidence of that in the record. Corrective action of what? As I said, placing some small burden on the employee to enforce the direction that's given, so the record is on the maintenance supervisors that they can, in a literal sense, correct people and show them how to perform a task correctly, but there's nothing showing that they can do anything to enforce a direction and take corrective action if a direction is not followed. So, we're all in the business of uncorrectable mistakes. Is that what you're implying? No, it's just, it's just, again, I mean, the way that, the only way the company would have been able to demonstrate that is by saying, here's a supervisor who allowed the employee, who employee under his watch made a mistake, and he had to do something, but there's, for whatever reason, there, if there's no evidence of mistakes, how can the company, you know, bear a burden of showing that they have corrective authority? Well, I mean, there are, I will say, there are, there are people, there are several maintenance supervisors who are long-term, you know, 20 and 30-year employees, and it is surprising that the company wouldn't be able to come up with any evidence in its favor from those employees. In addition, one of the employees, I believe it was Mr. Wilkinson, testified that he was actually held accountable 25 years ago for a mistake of his crew, but then he also testified that in a separate incident, he was not held accountable for a crew mistake, and so the evidence that the company presented is in conflict, and of course, it can't meet its burden of proving the supervisory status by preponderance when the evidence is in conflict. I'll additionally say there, the company places great emphasis on Mr. Thornton's testimony at pages 562 to 63. Mr. Thornton is a manager. He related an incident in which a supervisor, a maintenance supervisor, allegedly was held accountable, but in that instance, if you look at the testimony in Mr. Thornton's testimony, in his own description of that incident, the supervisor is being held responsible for his own failing. He failed to report an injury of a member of his crew. But you just said they're not accountable. Right. He was not held accountable for the performance of another. He was held accountable for his own failure of performance, and that distinction is extremely important, and again, it's something that this court embraced in entrogy at footnote one. I'd like to just briefly go back, if I may, to Maine Yankee and note some of the other distinctions, some of the factual distinctions that the court should keep in mind if it does want to look at that case. The employees at issue in that case were equivalent to the shift managers in the case involving the unit supervisors here. They were the top level employees who were in overall charge of the control room. The unit supervisors in this case are not in charge of the control room. The shift manager is in charge of the control room. The second difference is in Maine Yankee, there was nothing like an authorized work schedule, and in fact, there was specific testimony in the record in that case that although there were many procedures that were governed by written guidelines, there were many more that were not governed by written guidelines, and so there was a great deal of room for discretion by the was in charge of the control room. I would say that those factual distinctions are highly important to the extent that the company is arguing that the supervisors here are like those in Maine Yankee, that's simply not factually true. If the court has any specific questions about other elements. Let me ask you a question. I have trouble being sure in my own mind what driving this fight. The, these allocations would affect the makeup of the bargaining unit, and but but it wouldn't appear to be the question of vote counting and whether the union is is to be certified or not. In other words, the characterization of them. The, normally the question of supervisor or whatever has consequences elsewhere in terms of Fair Labor Standards Act and salary, but the distinction here that we're laboring with, I guess I don't really understand why everybody's going to the mat on what difference does it make ultimately the big picture. This thing's operating functionally, doing well, and unquestionably it's the whole nature of the project is you don't want mistakes, but everybody's in that business. So I guess what's driving this? What's, what's the big issue here? I mean do you, the great legal principle you're defending either on both either side. Right, what's at stake in this, in these two cases is the right of these employees to be represented by a labor union. Supervisors can't be represented by a union. Because the individual, those particular individuals, how many of them are there? I think there are about 29 unit supervisors. 29. And the union. 3,000 mainland supervisors approximately. I'm sorry, in the existing bargaining unit there are 475 some employees. I know they're there now, but how many of them are in this issue here? It's whether in the bargaining unit or not. I think in total between these two groups of employees there are probably less than, there are probably about 50 employees. 50? Yeah, I don't have the. I don't hold you up. It's about 60. I had 66. I don't know where I got it. Yeah, right, right. That's, and it's the right of those employees to be represented by a labor union that's at issue. And the board, the company is refusing to bargain with the union as the representative of these two groups of workers on the theory that they are supervisors who are excluded from the argument. I understand the legal framework of the argument. Right. I'm sorry, I apologize, Your Honor, if I misunderstood. No, no, you. I mean, does the board's position in, with respect to these particular employees, have ramifications across the nuclear power industry? No, no, it doesn't. And if that was the question, I apologize for not understanding it. The company has characterized this as a ruling that has ramifications throughout the industry. That's just not true. The board looks at each industrial setting in each case and the record in each case and considers whether there is evidence to establish supervisory status on the facts of the case. So this case is not presidential for any other nuclear power plant, is essentially identical to this one in the way that it functions? Well, they're all going to be identical because they're all governed from top to toe by federal regulation. I, I, I can't. Well, I don't know that we know that that's true, Your Honor, but. Well, let me, but let me just ask you one thing. I did, I did ask you about the assignment criterion. Right. And if they meet the assignment criterion, they're supervisors. And it does seem to me that the ALJ and the board minimize to the point of not even recognizing the, the fact that they intermingle the different maintenance crews. Right, right. And I don't. And exercise total independent discretion over how to acknowledge that these, these maintenance supervisors do quite a bit of giving of discrete tasks to people and the overriding concern in those assignments is certifications. That is in the board's findings. In terms of specifically addressing the swapping, it's, it's perhaps true that the board didn't specifically address that, but the board did specifically address the idea that in all of these various kinds of movements and assignments, the goal is simply, and I'm going to quote the testimony of Mr. Langston, who's a maintenance supervisor, is to quote, get the right certification on the right crew. That's at page 8, 817 of the record. And several other maintenance supervisors confirmed that they are just moving people around between crews, collaborating as needed to make sure that if Crew A needs a certified electrician, they have the certified electrician from wherever he may come. Well, obviously, but all of that depends on what work is being done, you know, in the plant at a particular time and what the needs are and, and who's, I mean, it seems to me that is very responsible and independent work on the part of these supervisors. Right, for, for purposes of assignment though, again, the issue is do they assign people to a, to a shift, to a location and significant or significant overall duties, and I would say these temporary swaps are not evidence of any one of those. But you're making that up because the board didn't say anything about that. Well, as I said, the board did address the certification-driven nature of these task assignments, and that is all a swap is. It's, it's a movement. Not necessarily, not necessarily, because this board also acknowledges that they would have training functions in making assignments and that they would have, you know, the one fellow who testified that I assigned so-and-so, I will, I like to borrow so-and-so because he has such a great work ethic. I mean, there are, there are managerial thought processes that go into assigning people in these critical maintenance duties. Right, the, the, the definition of independent judgment though, for purposes of Section 211, is whether a person is acting free of the control of others and forming an opinion or evaluation by discerning and comparing data. So if you look at this, if you look at this situation where they're swapping people primarily to get... You know what, I mean, that's like saying all I need is a lawyer. All I need is one supervisor in a legal department. I can bring lawyer A from the tax department or lawyer B from the condemnation department, and all we need is the J.D. degree. No, Your Honor, I mean, I don't... Of course, it's exactly, I don't see how it differs, and I don't see how the evidence says, you know, realistically can be narrowed to that artificial criteria. Well, it's in the statute that independent judgment is to be distinguished from routine or clerical determinations, and all the Board is saying in this case is these people may be making assessments and evaluations as they go, but they don't rise to the level of independent judgment under the Act. They're fairly routine. They are based on certifications or a person liking someone's work ethic. There's no complex evaluation of factors that goes on, and I would ask the Court to look at page 787 to 789, Mr. Wilkinson's testimony on this point, and page 218, which is Mr. Presswood's testimony. Everyone is sort of in agreement that these swaps are of a very routine nature. There isn't much that goes into them. Only Mr. Thornton, who was a manager, again, testified that cross-training could be a consideration. Yes, but again, I'm telling you, I mean, you know, I manage law clerks. That's all I've ever managed, but I was Chief Judge briefly, but you don't manage people. When you're telling people to do something, you don't look at every J.D. degree is equal, and I don't see why this situation is any different, but you and I can agree to disagree. Thank you, Your Honor. The Board did look at the specific evidence in the record to see whether it lines up with any of the factors in Section 211, and it found reasonably that there is no showing by the company that these people exercise any of the 12 forms of supervisory authority. Thank you, Your Honor. All right, thank you. Okay, Ms. Rogers. I just addressed a few points made by counsel. So, one of the last things she said was that the Board looks at each industry in each case. I think it's evidenced by both of these decisions that that's clear that didn't happen. The whole section, which is identical in, I mean, actually both of the decisions are almost practically identical, which totally questions how individualistic the analysis was in terms of looking at the evidence in each case, but the only analysis the Board gives about the industry is two sentences in the very beginning, which just say, I believe the word nuclear gets used because it's in the company's name, but no real analysis is done of, again, almost 100 pages of testimony by Mr. Jefferson on this industry, its uniqueness, its safety concerns, no mention at all of the regulations that were entered into evidence, the job descriptions that were entered into evidence, that they're not just paper There's no mention at all of the fact that these procedures are governed by the Nuclear Regulatory Commission and require that the company have these policies. So, it's not just that STP came up with policies to try to direct people. They're a nuclear power plant that is required to have such policies, but there's no mention again of that at all in either of the Board's decisions. Regarding Maine Yankee in the attempt to sort of just totally discount it and undercut it because it's 40 years old, I think there's a number of reasons why the case is applicable here. First is the Board's attempting to give Oakwood and Energy Mississippi a standard that's just not there. The reality is Oakwood and the Board does this, I mean we sort of see it a lot in the they want to overturn a case, they do it. They say it. They make it explicit. Here, Oakwood doesn't say that I'm overturning all of this law and I think this court in Energy Mississippi says it's an expanded definition. So, I think it's an overstatement to say that Maine Yankee has no value just because it's 40 years ago. The case is spot on to our situation here. The mention again, I think the question Judge Duncan, you asked about the incentive compensation program and there is testimony. There's testimony in the record about that being an adverse consequence that the supervisors suffered. There's documentary evidence in the record about it that again gets no mention by the Board. I think what counsel said about Supervisor Tillman is another illustration of the Board attempting to put a higher standard than Oakwood or Energy Mississippi calls for. The requirement there, counsel said, he didn't know it happened. There's no requirement that he know that why it happened. What the law says is that has to be a prospect of an adverse consequence and there is. And again, they're trying to make this requirement that it had actually happened. I apologize, but that's not the actual requirement in the law. I think another is just to the accountability is the discounting of Wilkinson that again, it ignores the testimony in the in the record. There's no mention at all of Sean Flaherty's long title, whatever it is, government regulations and things, but who specifically testifies we don't have a lot of disciplinary problems. I think he says 2% or something of turnover at the at the plant. So what Wilkinson testifies about happened, you know, it did happen. But again, there's no requirement in the law that it have happened within six months or eight months or nine months. That's a new made up requirement by the board to again, totally try to undercut the evidence that is in the actually in the record. And then Judge Higginbotham to address the question you asked both of us about what difference does it make that these people are in the unit? You know, the board tries to say, well, it's it's, you know, it's about being in the union and that's what they want to be. But it that's not true. The law says that you don't want supervisors in the union for a reason that interests are not aligned. And I think here, while secondary in Disha, you have evidence that these people make, I think, an hour or more. Exactly. Yes. $10, $12 more an hour. Their bonus is 50% or greater more than these individuals. They attend supervisory meetings that these people don't attend trainings or uniforms are different. The amount and this is something that the board totally gets wrong for the unit supervisors is saying that their training is the same. Ignores the evidence, it ignores the evidence that was put in on that they received 18 months more training to get the licensure that they do to be a unit supervisor. So it does make a difference to have these people who are supervising every day telling you what to do in the unit who can discipline you or things like that. And to main Yankee or to the point also about guidelines, I believe there was an attempt to distinguish main Yankee because it said she said there's record evidence that it couldn't cover but that's the same here. Obviously, like Hamilton testifies that the AWS says this task needs to get done, but he specifically says it does not tell me how to do it. It does not tell me who to assign it to. It doesn't tell me the time to do it. So again, this is the board cherry picking, you know, random bits of testimony to ignore large swaths of testimony that are in the record that do support these things. And again, not in these aren't I don't think can be dismissed as any sort of like credibility findings or anything like that because the board again doesn't even mention them. They're not saying as an energy Mississippi, the court did that. Hey, there's some contrary testimony about this discipline issue and the company, you know, the supervisor says it happened, but then the manager gets up and testifies and says, I don't really remember discipline this guy and our policy is to write people up and there's no evidence. That's not the case here. We don't have credibility distinctions. We have the ALJ to the extent anything actually gets mentioned saying sure they go to meetings, but and then never addressing, you know, the requirement is if you're going to be if it's going to be supported by substantial evidence, there needs to be some explanation. And that's just clearly not given in these decisions, which are, again, I think if you look at them pretty formulaic copy and paste jobs, and that's not the board doing what it's supposed to do. Okay. Thank you very much.